# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7196 | **DATE** | 11/*/2002 |
| **CASE TITLE** | KATHERINE KERR vs. WGN CONTINENTAL BROADCASTING | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Plaintiff's motion to amend judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | NOV 0 6 2002 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 51 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| EF | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
NOV - 6 2002

| | |
|---|---|
| KATHERINE KERR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 01 C 7196 |
| ) | HONORABLE CHARLES R. NORGLE |
| WGN CONTINENTAL ) | |
| BROADCASTING CO.; and TRIO ) | |
| VIDEO, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Plaintiff's motion to amend judgment, which is in substance a timely filed motion under Federal Rule of Civil Procedure 59(e). Plaintiff's motion is directed to the court's order granting summary judgment in favor of Defendant WGN Continental Broadcasting Co. See Kerr v. WGN Continental Broadcasting Co., No. 01 C 7196, 2002 WL 1477629 (N.D. Ill. July 9, 2002). For the following reasons, Plaintiff's motion is denied, but the court expands its reasons for granting WGN's summary judgment motion.

### I. BACKGROUND

Katherine Kerr sued WGN claiming that WGN discriminated against her in violation of Title VII by permitting a hostile work environment and by retaliating against her for complaining of the hostile environment. A short discussion of the factual background is necessary to place Kerr's motion to amend the judgment in context.

WGN is, *inter alia*, a broadcasting company that airs television programs locally in the Chicago area and nationally through cable television. WGN televises some of the games played by



local sports teams, including the Chicago Cubs, Chicago White Sox, and Chicago Bulls. WGN is not the exclusive broadcaster for such games, as other networks, such as ESPN and Fox Sports Net Chicago also broadcast their games.

To broadcast sporting events, WGN uses a mobile production facility, commonly known as a broadcast truck, which contains the equipment necessary to broadcast live from the stadiums where the games are being played. WGN does not own the broadcast trucks it uses for sporting events. Instead, WGN contracts with Co-Defendant Trio Video to provide WGN with broadcast trucks and related production personnel. Trio Video and WGN have had such contracts for a number of years.

In the early 1990's, Kerr began working with Trio Video and received assignments to work sporting event broadcasts. Kerr's job was that of a television stage manager, which is also known as an assistant director. In performing her duties, Kerr would sit in the broadcast booth during games and assist with the coordination of the show. Kerr was responsible for providing the on-air broadcasters with current information about the game, such as pitching and lineup changes. Kerr advised the broadcasters whether they were on or off the air and provided promotional materials and cues for on-air readings. Kerr's position placed her in front of video monitors that received images from cameras throughout the venue. Kerr also wore a headset/microphone to communicate with other production personnel, through which she necessarily heard all their communications.

Kerr alleges that she was subject to a sexually hostile environment when she worked WGN broadcast Chicago Cubs home games. According to Kerr, the camera operators would take gratuitous footage of female spectators and show that footage repeatedly on video monitors within Kerr's sight. Kerr also claims that the camera operators would engage in overtly sexual conversations on their communication equipment, which Kerr had no choice but to overhear. Kerr

has alleged a litany of instances in which she was subject to viewing and hearing sexually oriented material. All of these instances occurred during WGN broadcast Cubs home games.

As noted above, WGN is not the exclusive broadcaster for Cubs home games. WGN broadcasts approximately 50% of the home games, with Fox Sports Net Chicago broadcasting the other 50%. Kerr's duties were not limited to WGN broadcasts or Cubs games. She also worked games played by other local teams, and worked on sporting events that were broadcast by other networks, such as Fox Sports Net Chicago and ESPN. Kerr's allegations of a hostile environment are limited to WGN broadcast Cubs home games. She makes no allegation of any improper conduct during any other broadcasts that she worked.

Kerr claims that in June of 2000 she complained to both WGN and Trio Video about the harassment. According to Kerr, her complaints had no effect on the allegedly hostile environment, and she encountered resistance when she complained to a WGN senior producer. Kerr alleges that on October 11, 2000, WGN informed Trio Video that WGN no longer wanted to use Kerr as a stage manager. Subsequently, Kerr alleges that Trio Video terminated her.

Early in the litigation, the question of Kerr's status as an employee of WGN arose. WGN took the position that it had never employed Kerr, and therefore, could not be liable to her under Title VII. Kerr asserted that she had been employed by WGN, and even if she had not, WGN could still be liable to her under Title VII. The court invited WGN to file a motion for summary judgment to crystallize the issue. After full briefing, the court granted WGN's motion, finding that there were no questions of material fact concerning the lack of an employment relationship between Kerr and WGN. See Kerr, 2002 WL 1477629, at *3-7. The court also rejected Kerr's alternative theory that WGN could incur Title VII liability to Kerr based on a de facto employer/interference theory. Id.

at *7-8. In the same order, the court denied Trio Video's motion for summary judgment, finding that there was evidence that Kerr had been employed by Trio Video. See id. at *3-7.

Kerr now moves to alter the court's judgment on her alternative theory that WGN can incur Title VII liability absent an employment relationship. Kerr argues that the court misconstrued the differences between so-called "de facto" employer liability and "interference" liability. The issue is fully briefed and ripe for ruling.

## II. DISCUSSION

### A. Standards for Rule 59(e):

Federal Rule of Civil Procedure 59(e) permits the court to alter or amend a judgment if the moving party brings the motion within ten days of the judgment. Relief under Rule 59(e) is not easy to obtain. Usually, the only grounds on which to grant a 59(e) motion is newly discovered evidence, an intervening change in the controlling law, or a manifest error of law. Cosgrove v. Bartolotta, 150 F.3d 729, 732 (7th Cir. 1998). "The rule essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." Russell v. Delco Remy Div. of Gen. Motors Corp., 51 F.3d 746, 749 (7th Cir. 1995). Whether to grant or deny a Rule 59(e) motion "is entrusted to the sound judgment of the district court." Matter of Prince, 85 F.3d 314, 324 (7th Cir. 1996). Here, Kerr's motion is timely, and she argues that the court's interpretation of her alternative theories of liability was erroneous, bringing the motion within the scope of Rule 59(e).

### B. Alternative Title VII Liability Theories:

Kerr has asserted two alternative theories of Title VII liability against WGN: (1) de facto, or indirect, employer liability; and (2) interference, or aider and abettor, liability. See E.E.O.C. v. State

4

of Illinois, 69 F.3d 167, 169-71 (7th Cir. 1995) (discussing alternative theories of liability in an age case, and noting similar analysis in Title VII cases). Kerr argues that the court incorrectly construed her alternative opposition to WGN's summary judgment motion as being limited to the de facto/indirect liability theory, and that the court did not adequately address her interference theory claim. To fully address Kerr's argument, it is necessary to trace the history of these alternative theories of Title VII liability and their development in the Seventh Circuit.

In Sibley Mem. Hosp. v. Wilson, the Circuit Court of Appeals for the District of Columbia held that a Title VII claim could proceed against a defendant that fit the statute's definition of "employer," but with which the plaintiff did not have a traditional employment relationship. See 488 F.2d 1338, 1340-44 (D.C. Cir. 1973). The plaintiff in Sibley was a male nurse who worked for patients in private hospitals. Id. at 1339-40. These hospitals had arrangements with registries that would match the patient's need for a private nurse with the name of a nurse who indicated his or her availability for such assignments. Id. Patients would communicate their need for a private nurse to the nursing office of the hospital, the nursing office would then contact the registry, and the registry would in turn contact and instruct the nurse to report for duty. Id. Nurses such as the plaintiff did not have traditional employment relationships with the hospitals where they rendered services. The case arose after two incidents at the defendant hospital where the plaintiff reported for duty, and supervisory nurses rejected him for the assignments because he was male and the patients were female. Id.

The D.C. Circuit ruled that the plaintiff could bring a Title VII claim against the hospital, notwithstanding the absence of a traditional employment relationship between the parties. See Sibley, 488 F.2d at 1341-42. The Sibley opinion focused on the statutory language of Title VII,

which defines defendants as "employers," labor unions, and employment agencies, and identifies the party entitled to sue as "any individual."[1] See id. The opinion did not accept the position that a Title VII plaintiff had to be an employee of the defendant employer. The Court reasoned as follows:

> Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by an individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

Sibley, 488 F.2d at 1341. The implicit rationale of Sibley is that Title VII identifies a class of defendants that can be liable for illegal employment discrimination. See id. Such defendants can incur liability without regard to a direct employment relationship with the plaintiff. See id. at 1341-42.

In Doe v. St. Joseph's Hosp. of Fort Wayne, a divided panel of the Seventh Circuit adopted Sibley's rationale. See Doe v. St. Joseph's, 788 F.2d 411, 421-25 (7th Cir. 1986). The plaintiff in Doe was a physician that brought a Title VII claim against the defendant hospital, claiming that the hospital discriminatorily interfered with her employment opportunities with her patients. See id. at 423. Doe accepted Sibley's broad interpretation of Title VII, noting that the statutory language did

---

[1] In relevant part, Title VII reads:
   It shall be an unlawful employment practice for an employer –
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .
42 U.S.C. § 2000e-2(a).

6

not indicate that Title VII relief should be limited to employees of a Title VII employer. Id. at 422. After Doe, several decisions from the Northern District of Illinois permitted Title VII actions to proceed despite the absence of a direct employment relationship between the plaintiff and defendant. See e.g. Morrison v. American Bd. of Psychiatry and Neurology, Inc., 908 F. Supp. 582 (N.D. Ill. 1996); E.E.O.C. v. City of Evanston, 854 F. Supp. 534 (N.D. Ill. 1994) (chambers opinion); Pelech v. Klaff-Joss, L.P., 815 F. Supp. 260 (N.D. Ill. 1993); Vakharia v. Swedish Covenant Hosp., 765 F. Supp. 461 (N.D. Ill. 1991).

The Seventh Circuit, however, began retreating from Sibley. Two opinions noted Sibley in dicta, but declined to confront the question of whether a Title VII employer could be liable to someone who is not its employee. See Bullard v. Sercon Corp., 846 F.2d 463, 466 (7th Cir. 1988); Shrock v. Altru Nurses Registry, 810 F.2d 658, 660 (7th Cir. 1987). Then, two opinions held that independent contractors were not proper plaintiffs in a Title VII action, and therefore could not maintain such an action against entities that did not directly employ them. See Ost v. West Suburban Travelers Limousine, Inc., 88 F.3d 435, 440 (7th Cir. 1996); Knight v. United Farm Bureau Mutual Ins. Co., 950 F.2d 377, 380-81 (7th Cir. 1991).

In E.E.O.C. v. State of Illinois, the Seventh Circuit expressly questioned Sibley's rule. See 60 F.3d at 169. Writing for the Court, Judge Posner noted that the concept of indirect or de facto employer liability is analytically distinct from interference or aider and abettor liability. Id. Indirect liability arises when the defendant employer "so far control[s] the plaintiff's employment relationship that it [is] appropriate to regard the defendant as the de facto or indirect employer of the plaintiff . . . ." Id. at 169. By contrast, the concept of interference or aider and abettor liability is much more limited. See id. Judge Posner did not define the full scope of interference or aider and

abettor liability, and as will be discussed in greater detail below, doubted that it even exists. See id. at 169-71.

In Alexander v. Rush North Shore Med. Ctr., the Seventh Circuit recognized that Doe was irreconcilable with Ost and Knight. See Alexander, 101 F.3d 487, 488 (7th Cir. 1996). Each of these cases involved a Title VII plaintiff asserting a claim against an entity with which the plaintiff did not have a direct employment relationship. All of the plaintiffs were independent contractors, and thus did not have a direct employment relationship with any Title VII employer. Doe permitted such a suit to proceed, while Ost and Knight did not. Alexander overruled Doe, and held that a plaintiff must have a traditional employment relationship with some entity in order to maintain a Title VII action. See Alexander, 101 F.3d at 491-93. Because the plaintiff in Alexander was an independent contractor, and thus did not have an employment relationship, the plaintiff could not proceed under Title VII. See id.

Alexander was carefully limited to overruling Doe's holding that an independent contractor could bring a Title VII action. See Alexander, 101 F.3d at 493 n. 2. Alexander expressly left open the question of whether "an employee of employer X may bring a Title VII action against employer Y when Y is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer X." Id.

In light of this unsettled state of the law, this court rejected Kerr's alternative theories of liability against WGN. See Kerr, 2002 WL 1477629, at *7-8. The court accepted the Seventh Circuit's indication from E.E.O.C. v. State of Illinois that de facto/indirect Title VII liability was a viable theory, and analyzed Kerr's case under that theory. See Kerr, 2002 WL 1477629, at *7-8. But admittedly, as Kerr points out, the court's analysis was not surgical on the distinctions between

8

de facto/indirect liability and interference liability. The court takes this opportunity to sharpen its position. The court recognizes the existence of de facto/indirect employer liability for violations of Title VII, and re-affirms its conclusion that WGN did not exercise sufficient control over Kerr to be considered her de facto or indirect employer. The court also rejects the existence of interference or aider and abettor Title VII liability and holds that Kerr cannot proceed against WGN on that theory.

### 1. Defacto/Indirect Liability:

De facto or indirect employer liability depends on the amount of the control a putative Title VII defendant exerts over the plaintiff's employment. This theory of liability addresses the situation where a formal employment relationship may be absent, but the putative defendant is so extensively involved with the plaintiff's day to day employment that the putative defendant is the "real" employer for all intents and purposes, including Title VII liability. See E.E.O.C. v. State of Illinois, 69 F.3d at 171-72 (noting that an entity that "pulls the strings" in the background, and essentially controls employment decisions will be considered the de facto employer for purposes of Title VII liability).

Kerr argues that the court's original ruling created a Catch-22 for plaintiffs asserting an alternative Title VII liability theory. According to Kerr, the court's focus on a putative defendant's control over the plaintiff renders the analysis repetitive of the common law agency principles used to determine a direct employment relationship. Kerr claims this puts plaintiffs into the difficult position of having to prove a direct employment relationship in order to proceed on a Title VII claim. Kerr's argument is wrong for two reasons. First, the argument rests on the incorrect premise that the court's original opinion was addressing interference liability instead of de facto employer liability. The court's analysis was consistent with those cases that are properly construed as de facto liability

9

theory cases, which examine the amount of control the putative defendant exercises over the plaintiff. See generally E.E.O.C. v. State of Illinois, 69 F.3d at 167-71 (analyzing liability that may arise where an entity is making behind the scenes decisions about material terms of employment such as hiring, firing and rate of pay); Pelech, 815 F. Supp. at 263 (denying an indirect employer's motion to dismiss, noting that the indirect employer had the ultimate responsibility for hiring and firing decisions); see also Papa v. Katy Indus., Inc., 166 F.3d 937, 941 (7th Cir. 1999) (noting the liability that a parent corporation would incur if it directed a subsidiary corporation to violate anti-discrimination laws).

Second, the de facto employer control analysis does not create the Catch-22 that Kerr claims. It is true that control is a major factor in the common law agency test that is often used to determine a direct employment relationship. See e.g. Hojnacki v. Klein-Acosta, 285 F.3d 544, 549-50 (7th Cir. 2002); Alexander, 101 F.3d at 492; Ost, 88 F.3d at 437-38. This does not mean, however, that a Title VII plaintiff must effectively demonstrate a direct employment relationship with a defendant. Instead, the de facto/indirect analysis is appropriately used where it is clear that a putative defendant does not directly employ the plaintiff, but nevertheless controls the plaintiff's employment to the point that it would contravene the intent of Title VII for the putative defendant to avoid liability for its own discriminatory actions. See Papa, 166 F.3d at 941; E.E.O.C. v. State of Illinois, 69 F.3d at 171-72. In its original order, the court found that WGN's control over Kerr's employment was insufficient to render WGN liable as Kerr's de facto or indirect employer. See Kerr, 2002 WL 1477629, at *7-8. The court re-affirms that finding now for the reasons stated in the original order. Id.

**2. Interference Liability:**

The court assumes for the purposes of this motion that WGN and Trio Video are Title VII employers, and that WGN permitted a sexually hostile environment to exist during WGN broadcast Cubs home games. Thus, this case fits within the question that Alexander left unanswered: Whether Kerr may bring a Title VII action against WGN when WGN is not Kerr's employer, but is an employer whose discriminatory conduct interfered with Kerr's employment with Trio Video. See Alexander, 101 F.3d at 493 n. 2.[2]

One judge in the Northern District of Illinois has answered the Alexander question in the affirmative, and permitted a Title VII action to go forward on an interference theory. See E.E.O.C. v. Foster Wheeler Constructors, Inc., No. 98 C 1601, 1999 WL 515524, at * 9-11 (N.D. Ill. July 14, 1999). Kerr relies on Foster Wheeler and a pre-Alexander case, Morrison v. American Bd. of Psychiatry and Neurology, Inc., and urges the court to recognize the interference theory of liability. If the court were to do so, Kerr asserts that she need only demonstrate: (1) an employment relationship between herself and Trio Video; and (2) that WGN, a Title VII employer, was capable of interfering with Kerr's employment relationship with Trio Video. See Morrison, 908 F. Supp. at 586.[3] Kerr claims that she has the necessary employment relationship with Trio Video, and that at

---

[2] The court assumes that a hostile environment qualifies as discrimination that could interfere with an employment relationship as contemplated by Sibley.

[3] Morrison was decided prior to Alexander, and is inconsistent to the extent that Morrison permitted an independent contractor to pursue a Title VII claim. Compare Alexander, 101 F.3d at 494, with Morrison, 908 F. Supp. at 584-87. Nevertheless, assuming the existence of an employment relationship between a plaintiff and some entity, Morrison's interference analysis was unaffected by Alexander. Morrison's interference analysis is also consistent with Foster-Wheeler.

11

this stage of the litigation, she is entitled to the inference that WGN interfered with her employment with Trio Video.

In light of Judge Posner's analysis of interference/aider and abettor liability in E.E.O.C. v. State of Illinois, this court concludes that such a theory is unavailable in a Title VII action. Accordingly, this court respectfully disagrees with its colleague's decision in Foster Wheeler. With this conclusion, the court also must disagree with other pre-Alexander decisions from the Northern District of Illinois, Morrison, 908 F. Supp. 582; Pelech, 815 F. Supp. 260; Vakharia, 765 F. Supp. 461, including an opinion decided by this court, E.E.O.C. v. City of Evanston, 854 F. Supp. 534, to the extent that these decisions permit interference/aider and abettor liability.

The implicit rationale of Sibley and its progeny is that Title VII creates a class of defendants, i.e., employers as that term is defined in the statute, labor organizations, and employment agencies, and identifies those entitled to bring suit, i.e., "any individual." See Sibley, 488 F.2d at 1341; Foster Wheeler Constructors, Inc., 1999 WL 515524, at * 9-11; E.E.O.C. v. City of Evanston, 854 F. Supp. at 537-38; see also 42 U.S.C. §§ 2000e-2(a) to 2(c). In dicta, the Seventh Circuit has rejected the idea that Title VII creates a class of defendants that can be liable to individuals, without the limitation of an actual or de facto employment relationship:

> We think it very doubtful that laws which forbid employers to discriminate create a blanket liability to employees of *other* employers for interference with *their* employment relationships. It might be a good idea to impose liability on those who aid or abet violations of those laws, but what sense would it make to confine that liability to persons or firms that happen to be employers? Since it would make very little sense that we can see . . . we find it implausible to impute to Congress an intention to create, by language not at all suggestive of any such intention, aider and abettor liability of one employer to the employees of another employer.

12

E.E.O.C. v. State of Illinois, 69 F.3d at 169 (emphasis in original). The above statement is dicta, but it indicates that the Seventh Circuit will hold that interference/aider and abettor liability is not available under Title VII, and that is how the court interprets the statement.

The limitation of an actual or de facto employment relationship as a necessary element to Title VII liability is underscored by Alexander, Knight, and Ost, which all stand for the proposition that an independent contractor lacking a traditional employment relationship with an employer cannot bring a Title VII action.[4] See Alexander, 101 F.3d at 492; Ost, 88 F.3d at 440; Knight, 950 F.2d at 380. These cases instruct that an employment discrimination plaintiff's remedy is against his or her employer, and that independent contractors are necessarily foreclosed from such claims for relief. In the event that the plaintiff has a de facto employer that is truly pulling the strings and making the material employment decisions as to the plaintiff, the plaintiff can proceed against that employer despite the absence of a direct employment relationship. See E.E.O.C. v. State of Illinois, 69 F.3d at 169-71; cf. Papy, 166 F.3d at 941-42. But for a plaintiff whose employment is interfered with by a third party, the remedy is against the direct employer for the discrimination, not the third party. See e.g. Bullard, 846 F.2d at 466 (dicta noting that a direct employer's liability for discrimination inflicted by another employer depends on what the direct employer did in response to the alleged discrimination); cf. Frazier v. Delco Electronics Co., 263 F.3d 663, 666-68 (7th Cir. 2001) (noting that an employer does not violate Title VII unless and until it knows of illegal harassment and fails to act to correct the situation). The direct employer has the means of controlling

---

[4]The rejection of the theory of interference liability should not be construed as foreclosing failure to hire claims brought by persons that have been rejected for jobs on invidious grounds. Such applicants have the necessary prospective employment relationship with an employer to bring a claim for relief. See e.g. Kyles v. J.K. Guardian Sec. Servs., 222 F.3d 289, 295-300 (7th Cir. 2000) (holding that E.E.O.C. "testers" had standing to bring a Title VII failure to hire claim).

the terms and conditions of the plaintiff's employment, and is therefore the focus of the anti-discrimination laws. See e.g. Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2269-70 (1998) (analyzing agency principles to illustrate tangible employment actions).

This conclusion is further underscored by the Seventh Circuit's use of the term "aider and abettor" to describe the interference theory. A necessary component of any aider and abettor theory is that there is another, primary, violator of the law. See E.E.O.C. v. State of Illinois, 69 F.3d at 170; United States v. Valencia, 907 F.2d 671, 677 (7th Cir. 1990). In the context of employment discrimination laws, the primary violator must be the plaintiff's direct employer, for that is the party that determines the terms and conditions of the plaintiff's employment.

And, the Supreme Court and Seventh Circuit have repeatedly noted that Title VII is intended to encourage employers to create anti-discrimination policies and to develop effective grievance procedures for employees to report discrimination and obtain relief. See Burlington Indus., 118 S. Ct. at 2270; Shaw v. Autozone, Inc., 180 F.3d 806, 811 (7th Cir. 1999); Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1037 (7th Cir. 1998); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1014 (7th Cir. 1997). To that end, the Supreme Court has noted an affirmative defense to Title VII liability for employers that have effective anti-discrimination policies. See Burlington Indus., 118 S. Ct. at 2270. This fundamental purpose of Title VII, to encourage private anti-discrimination efforts, is thwarted if employers can incur liability to persons that are necessarily beyond the reach of the employer's policies.

Based on the foregoing, and after careful review of the parties submissions, this court must respectfully disagree with Foster Wheeler, and hold that interference liability is not a viable theory

14

of relief under Title VII. Kerr cannot proceed against WGN by claiming that WGN interfered with her employment with Trio Video.

### III. CONCLUSION

For the foregoing reasons, Kerr's motion to alter or amend the court's grant of summary judgment in favor of WGN is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: 11/4/02